IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

Case No.: 20-cv-80922-Cannon/Reinhart

ROBERT EBY,

                 Plaintiff,

v.

ERIC LEVINE,

                 Defendant.

_____/

ERIC LEVINE,

                 Counter-Plaintiff,

v.

ROBERT EBY; JAY SILVER; C.S.L.L. REST. CORP.;
and LUNCHEONETTE MANAGEMENT CORP.,

                 Counter-Defendants.

_____/

**REPORT AND RECOMMENDATON**

Presently before me are the parties' Cross-Motions for Partial Summary Judgment (ECF Nos. 76, 79), which the District Court referred to me for a Report and Recommendation.  ECF Nos. 99, 100.

With his motion, Eric Levine (Defendant/Counter-Plaintiff) seeks summary judgment in his favor on five breach of contract claims: one alleged by Plaintiff Robert Eby in the Complaint (Count I), as well as four alleged by Levine in his Amended and Supplemental Counterclaims (Counts II, III, IV, and VI).  ECF No. 76.  I have reviewed the Complaint (ECF No. 1), the Amended and Supplemental Counterclaims (ECF No. 29, 46), Levine's motion and declaration (ECF No. 76, 77), the parties' Joint Statement of Material Facts (JSF) (ECF No. 74), Levine's

statement of Material Facts (ECF No. 75), the Plaintiff/Counter-Defendants' response to the motion (ECF No. 93) as well as their Responsive Statement of Material Facts/Additional Facts (ECF No. 92), Levine's response to the Additional Facts (ECF No. 95), and reply to his motion (ECF No. 96).

The cross-motion is brought by Plaintiff/Counter-Defendant Eby and the three other Counter-Defendants: Jay Silver, C.S.L.L. Rest. Corp. (CSLL) and Luncheonette Management Corp. (LMC).  In the cross-motion, Eby moves for summary judgment on Count II of his Complaint which seeks a declaratory judgment, and the four Counter-Defendants seek judgment in their favor on Levine's Amended Counterclaims Counts II-V.  ECF No. 79.  In addition to the motion and pleadings, I have reviewed the Plaintiff/Counter-Defendants' Statement of Material Facts (ECF No. 80), Levine's response to the motion (ECF No. 91) and Responsive Statement of Facts/Additional Facts (ECF No. 90), as well as the Plaintiff/Counter-Defendants' reply brief (ECF No. 97) and their response to the Additional Facts (ECF No. 98).

These matters are now ripe for decision.  For the reasons that follow, I recommend that Levine's motion (ECF No. 76) be **DENIED** and that the Plaintiff/Counter-Defendants' motion (ECF No. 79) be **GRANTED IN PART AND DENIED IN PART.**

## UNDISPUTED FACTS AND PROCEDURAL HISTORY

On December 1, 2017, Levine and Eby entered into a Stock Purchase Agreement ("SPA") for the sale of Levine's interest in the New York City restaurant known as EJ's Luncheonette.  JSF, ¶ 1.  Attached as exhibits to the SPA are the following documents: (1) a Consulting Agreement whereby after the sale, Eby "must retain the services" of Levine as a consultant and pay him $5,500 per month;[1] (2) a Promissory Note to Levine in the amount of $204,998 with a maturity date of

---

[1]   According to the Consulting Agreement, this payment to Levine for his services was not

April 30, 2020, by which the corporate Counter-Defendants CSLL and LMC funded part of the

purchase of Levine's shares; and (3) a personal Guaranty by Eby and Silver promising to pay any

funds owed to Levine in the event of a breach of the SPA or any of its exhibits.  JSF, ¶¶ 2,4,6, and

11, ECF No. 1-1.

The SPA includes a provision regarding the parties' use of a residential apartment located

above the restaurant:

> **14. Apartment**. The Seller [Levine] and CSLL hereby acknowledge (i) that CSLL
> has had the benefit of the use of a residential apartment located above the Premises
> known and designated as Apartment 5 at 201 East 73rd Street, New York, New
> York ("**Apartment**"), (ii) such use is not clearly memorialized in the lease with
> respect to the Premises and CSLL is not charged an additional rent fee . . . [by] the
> landlord for the Premises ("**Landlord**") with respect to the Apartment, and (iii) a
> portion of the Apartment is utilized as sleeping quarters ("**Sleeping Area**") and a
> portion of the Apartment is utilized to maintain, keep and store the corporation
> books and records of CSLL and LMC ("**Office Area**"). The Seller has the right, for
> an aggregate of at leas[t] seven (7) days of each calendar month, to access (which
> access cannot be unreasonably withheld) the use of the Sleeping Area and
> Bathroom. CSLL hereby agrees that provided (x) CSLL continues to have access
> to the Apartment, (y) none of CSLL, LMC and/or their respective officers desire to
> utilize the Sleeping Area on the days requested by the Seller, and (z) the Seller shall
> be permitted to utilize the Sleeping Area on the requested days. In the event that
> the Landlord terminates CSLL's or any Officer's ability to utilize the Apartment,
> CSLL and Eby must send a copy of Landlord notification to Seller. Seller must be
> sent a copy of any and all correspondence between CSLL and Landlord at the time
> such correspondence is sent by CSLL or received by CSLL.

ECF No. 1-1 at 16.  The SPA also contains a provision whereby Eby and Silver could request a

monthly short-term line of credit (LOC) advance from Levine.  The funds were advanced from a

credit card in Levine's name and were only to be used to pay the restaurant's vendors.  Eby and

Silver were required to repay the advance in full every month.  If the LOC was timely repaid each

month, Levine would not charge interest and his "sole compensation" would be the "miles and/or

---

compensation; instead, it was to be categorized as "[a] monthly expense reimbursement."  ECF
No. 1-1 at 26.

other 'affinity points' accrued" on his credit card.  ECF No. 1-1 at 10-11.

The SPA and Consulting Agreement both contain confidentiality provisions.  JSF ¶¶ 3, 5.

The pertinent language in the SPA is as follows:

**15. Confidentiality**.
**(A)** The Seller [Levine] must keep any and all information of any nature whatsoever regarding CSLL and/or LMC and/or their business operations, finances and/or transactions whether written or oral that the Seller acquired as a result, directly or indirectly, of his ownership and involvement with the business of the Corporations (including without limitation, the terms and conditions of this Agreement)["**Confidential Information**"] strictly confidential and cannot at any time use for his own benefit and/or reveal, divulge or publish or make known, directly or indirectly, to any person, firm or corporation (other than the Seller's attorneys or accountants), any of the Confidential Information. It is hereby expressly understood that by disclosing said Confidential Information to the Seller, the Corporations do not grant any express, implied, or other license or right of any nature to Seller with respect to the Confidential Information. The parties hereto recognize that irreparable harm will result to the Corporations and their businesses and properties if the Seller fails or refuses to perform, or breaches, his obligations under this Article 15(A), and that the remedy at law for any such failure, refusal or breach will be inadequate. Accordingly, in addition to any other remedies and damages available, the Corporations, Eby and Silver shall be entitled to injunctive relief, specific performance and any other appropriate equitable relief . . . Nothing herein can be construed as prohibiting the Corporations, Eby or Silver from pursuing any other remedies in addition to equitable relief, including the recovery of damages.

ECF No. 1-1 at 16-17.

The confidentiality provision in the Consulting Agreement states:

**4. Confidential Information**. The Consultant [Levine] shall not at any time during the Term or thereafter use for his own benefit and/or reveal, divulge or publish or make known, directly or indirectly, to any person, firm or corporation, any of the Corporations" proprietary business information, whether written or oral, that the Consultant has acquired before or during the Term, if any (hereinafter referred to as "**Confidential Information**"). Notwithstanding the above, the term Confidential Information shall not include any information that is in the public domain or that enters the public domain through no breach of the Consultant's obligations hereunder. The Consultant shall not make any copies of Confidential Information without the express prior written consent of the Corporations. It is hereby expressly understood that by disclosing said Confidential Information to the Consultant, the Corporations do not grant any express, implied or other license or right of any nature to the Consultant with respect to the Confidential Information. Upon termination of the Term or termination of the Consultant's services for the

4

> Corporations irrespective of the time, manner or cause of same, the Consultant shall surrender to the Corporations all lists, books, records and documents provided by, belonging to, relating to or used in connection with the Corporations' business and/or all other property belonging to the Corporations.

ECF No. 1-1 at 26-27.[2]  The Consulting Agreement, which is referenced in the SPA as an "Additional Condition of Sale," was to "remain in place" and could "only be terminated" if EJ's Luncheonette ceased doing business in the New York Tri-State area or if the restaurant was sold to a bona fide unrelated third party.  JSF ¶ 3; ECF No. 1-1 at 2, 26.

The Promissory Note contained an attorney's fee provision stating that "In the event it shall become necessary for the Holder to employ counsel to collect this Promissory Note . . . then the Maker agrees to pay to the Holder any and all costs of such collection including, without limitation all reasonable attorneys' fees . . ."  ECF No. 1-1 at 52.  No other agreement at issue in this case allows for the recovery of attorney's fees.  SOF ¶ 54 (ECF No. 80, 90).

The parties performed their obligations under the agreements for a few years, but problems arose in the Spring of 2020.  On April 23, 2020, Eby sent a letter to Levine advising him that due to the Covid-19 pandemic and its impact on the restaurant's business, he would be

> "forced to temporarily take the following actions in an effort to preserve the viability of EJ's [Restaurant] going forward:
>
> 1.  suspend the Consulting Expense Payments (as defined in Section 3(A) of the [SPA];
>
> 2. defer the repayment of the Outstanding Balance[3] (as defined in Section 13(A) of the [SPA]; and

---

[2]  Paragraph 5 of the Consulting Agreement is entitled "Equitable Relief" and states that "[t]he parties hereto recognize that irreparable harm will result to the Corporations [CSLL and LMC] . . . if the Consultant [Levine] fails or refuses to perform his obligations . . ." thus, entitling the Corporations to equitable relief.  ECF No. 1-1 at 27.

[3]  The "Outstanding Balance" is defined in Section 13(A) of the SPA as an "unpaid balance . . . for a line of credit extended on Seller's credit cards for vendor bills pursuant to invoices dated from August, September and October 2017."

3. refrain from utilizing the LOC (as defined in Section 8 of the [SPA]).”

ECF No. 77 at 6. Eby concluded the letter by saying that he anticipated receiving a loan from the government's Paycheck Protection Program (PPP) and/or an insurance payment on his claim for business interruption, and that upon receipt of those funds he had "every intention of resuming payments to [Levine] in accordance with the [SPA] . . . and would start using the LOC once again." *Id.* at 7. Eby's letter did not state that he needed to defer payment on the Promissory Note.

Levine responded the following day, April 24, 2020, by sending a demand letter to the attorney representing Eby and the Counter-Defendants. The demand letter stated that Levine was "not agreeable to any deferment or forbearance of the amounts owed by Eby and the other parties under the SPA." ECF No. 77 at 9. The letter purported to list "a summary of the defaults under the SPA and related documents . . ." *Id.* Specifically, the letter sought payment of the balance owed on the Promissory Note ($64,998) although it had not yet matured, as well as payments for Levine's consulting services, LOC payments, and attorney's fees. *Id.* at 9-10. The letter concluded as follows:

> Based upon the preceding, demand is hereby made upon your clients to make the following amounts to Levine on or before **May 8, 2020:**

| | |
|---|---|
| Note: | $64,998.00 |
| Consulting: | $ 5,500.00 |
| Line of Credit: | $ 3,500.00 |
| Legal Fees: | $ 1,500.00 |
| Total | $75,498.00 |

*Id.* at 10; JSF ¶ 9.

Eby paid the Promissory Note in full on May 1, 2020, one day after it matured on April 30, 2020, and one week before the May 8, 2020 deadline imposed by Levine's first demand letter. SOF at ¶ 8 (ECF Nos. 80, 90). Levine sent another demand letter on June 8, 2020, and without mentioning the Promissory Note, he sought payment of his consulting fee ($5,500), the LOC

payments ($7,000), and $2,600 in legal fees, for a total of $15,100, which he demanded by paid by June 15, 2020.  ECF No. 77 at 12-14; JSF ¶ 10.

Two days later, on June 10, 2020, Eby commenced this lawsuit alleging that Levine had "committed the first material breach" of their agreements by accessing the office area of the apartment above the restaurant on January 20-21, 2020 without permission.  The Complaint alleges that Eby had surveillance video showing Levine copying and removing confidential documents, thus violating the confidentiality provisions of the SPA and the Consulting Agreement, as well as the SPA's provision limiting Levine's use of the apartment to the "Sleeping Area and Bathroom." ECF No. 1 at 8, 12.  Levine counter-sued for breach of contract on numerous grounds and alleged a claim for invasion of privacy based on the surveillance recording.  ECF Nos. 29, 46.

With the instant motion, Levine seeks summary judgment in his favor on Eby's claim for breach of the SPA and Consulting Agreement (*see* Count I of the Complaint) (ECF No. 1 at 7-8), asserting that Eby cannot establish that he sustained any damages a result of the purported breach. ECF No. 76 at 6.  Levine also seeks the entry of judgment on his counterclaims which allege that the Counter-Defendants breached the Consulting Agreement, the Promissory Note, and the Guaranty (Counts II, III, and IV of the Amended Counterclaims) (ECF No. 29 at 13-15).  Finally, Levine seeks summary judgment on his counterclaim that Eby and CSLL breached the SPA by denying Levine access to the apartment since November 2020 (Count VI of the Supplemental Counterclaims) (ECF No. 46).

In the cross-motion, Eby seeks a declaratory judgment that the line of credit provision in Section 8 of the SPA is discretionary and not mandatory (*see* Count II of the Complaint), consistent with the District Court's prior dismissal of Levine's Amended Counterclaim Count I (which alleged breach of the SPA's line of credit provision based on the Counter-Defendants' failure to

request LOC advances).  ECF No. 36.  The Counter-Defendants also seek summary judgment in their favor on Levine's Amended Counterclaims for breach of the Consulting Agreement, Promissory Note, and Guaranty (Counts II-IV) and on Levine's Amended Counterclaim for invasion of privacy (Count V).

## DISPUTED FACTS

At his deposition, Eby testified consistent with the allegations in his Complaint, namely, that video surveillance recorded Levine accessing the office area of the apartment on January 20, 2020, and showed Levine "surreptitiously access[ing] the bookkeeper's private desk" located in the office area of the apartment, "open[ing] a sealed interoffice envelope marked as 'Confidential,'" and copying the contents of the envelope.  ECF No. 1, ¶¶ 19-20; *see also* Eby Dep. Tr. (ECF No. 75-1) at 44:10-20; 69:7-18; 97:18-98:8.[4]

Levine disputes Eby's version of what the surveillance video depicts.  While he agrees that the video "appear[s]" to show him in the office area of the apartment, he notes that the video does not indicate the date or time of the recording, and he contends that the "bit of yellow" shown on the video "looks more like a ruler to me than an envelope."  *See* Levine Dep. Tr. (ECF No. 80-1) at 171:14-25.[5]  In the alternative, Levine testified that Eby authorized him to open the confidential envelope and review the documents therein.  *See* Levine Dep. Tr. 164:13-165:13; 166:2-167:13; 169:4-21.

According to Eby, the video further shows that on the following day, January 21, 2020,

---

[4]  Eby installed the surveillance cameras in the office area of the apartment at the end of 2019 because his bookkeeper realized that "somebody had been into her files" and Eby wanted to determine who it was.  *See* Eby Dep. Tr. 100:11-101:9.  Eby positioned the cameras to capture images of the bookkeeper's desk, the filing cabinets and the copy machine.  *Id.*

[5]  The Counter-Defendants provided the video surveillance recording (referenced in their Statement of Facts as Exhibits F-N) to the Court via a USB drive.  ECF No. 81.

Levine returned to the office area and "climbed on the office chair to access the confidential corporate files that were stored on the upper shelves . . ."  ECF No. 1, ¶ 23.  Eby contends the video shows that Levine "removed a bookkeeper file" from these shelves "and placed the file into his briefcase," and also shows Levine opening the bookkeeper's filing cabinets and copying confidential corporate sales and payment information.  *Id.* at ¶¶ 24, 25.  According to Eby, the video shows Levine searching the office and finding the password to the bookkeeper's computer, which he used to access and print confidential corporate financial information without consent. *Id.* at ¶¶ 26-27.

Again, Levine disputes Eby's version of what the video depicts.  According to Levine, it is not apparent from the video that he was initially unable to log on to the bookkeeper's computer, nor that he was searching for a password.  *See* Levine Dep. Tr. 182:20-183:20; 184:11-185:20. Levine alternatively testified that Eby authorized him to take the documents and that Eby "was aware," based on their past practices, that Levine "needed to access information" which he would "bring back to Florida" so they could "discuss [it] in the future."  *See* Levine Dep. Tr. 106:3-12; 107:18-108:4; 112:6-15; 113:21-24; 114:4-18; 115:10-116:4; 189:24-190:4; 190:16-19; 191:6-20; 239:12-16.  Levine initially testified that the documents he took from the apartment's office in January 2020 were in connection with his consulting duties (Levine Dep. Tr. 187:19-22; 188:5-13), but later in his deposition he claimed that Eby told him to take the documents because they would support Eby's "crazy" valuation of the restaurant shares that Levine wanted to buy back. *See* Levine Dep. Tr. 204:25-206:2.[6]  Eby denies giving Levine permission to take the documents.

---

[6] Both Eby and Levine testified that just before Levine went to the apartment on January 20, 2020, he and Eby had gotten into an argument; Levine was interested in negotiating a valuation for a buyback of his restaurant shares and he was angry at the valuation Eby proposed.  *See* Eby Dep. Tr. at 45:11-46:3; 48:21-23; 254:7-21; *see also* Levine Dep. Tr. 19:2-20:10.

*See* Eby Dep. Tr. 53:9-12; 252:12-16; 299:11-300:15.

Eby contends that he incurred damages as a result of Levine's impermissible conduct in the apartment.  Specifically, Eby seeks reimbursement of the cost to "reconfigure[e] the office area" of the apartment "for security reasons."  *See* Eby Dep. Tr. 234:2-235:4; 236:17-20; *see also* Additional Facts (ECF No. 92) at ¶¶ 20-21.  Citing to limited excerpts of Eby's deposition, Levine counters that Eby has not established the damages component of his breach of contract claim because there is "no evidentiary basis" for the alleged costs to secure the apartment.  *See* Levine's Response to Additional Facts (ECF No. 95) at ¶¶ 20-21.

Eby contends that neither the Promissory Note nor the Guaranty was breached because he paid the balance due on the Note on May 1, 2020 and was never in default.  *See* Additional Facts (ECF No. 92) at ¶ 31.  Levine counters that although Eby "eventually performed" by making a "balloon" payment on the Note, the payment was late and that Eby owes him attorney's fees for the two demand letters prepared by his lawyers.  *See* Levine Dep. Tr. at 26:5-10; 28:22-29:16.

## LEGAL PRINCIPLES

### *Motion for Summary Judgment*

The legal standard for summary judgment is well-settled:

> A party may obtain summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The parties may support their positions by citation to the record, including inter alia, depositions, documents, affidavits, or declarations. Fed. R. Civ. P. 56(c). An issue is genuine if "a reasonable trier of fact could return judgment for the non-moving party." A fact is material if it "might affect the outcome of the suit under the governing law." The Court views the facts in the light most favorable to the non-moving party and draws all reasonable inferences in its favor.
>
> . . .
>
> The moving party shoulders the initial burden of showing the absence of a genuine issue of material fact. Once this burden is satisfied, "the nonmoving party 'must

make a sufficient showing on each essential element of the case for which he has
the burden of proof.'" Accordingly, the non-moving party must produce evidence,
going beyond the pleadings, and by its own affidavits, or by depositions, answers
to interrogatories, and admissions on file, designating specific facts to suggest that
a reasonable jury could find in his favor.

*Rubenstein v. Fla. Bar*, 72 F. Supp. 3d 1298, 1307–08 (S.D. Fla. 2014) (J. Bloom) (citations

omitted).

The moving party's burden on a motion for summary judgment "depend[s] on
whether the legal issues ... are ones on which the movant or the non-movant would
bear the burden of proof at trial." *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115
(11th Cir. 1993). "[F]or issues on which the movant would bear the burden of proof
at trial, 'that party must show affirmatively the absence of a genuine issue of
material fact: it must support its motion with credible evidence ... that would entitle
it to a directed verdict if not controverted at trial.'" *Id.* (quoting *United States v.
Four Parcels of Real Prop. in Greene & Tuscaloosa Ctys. In State of Ala.*, 941 F.2d
1428, 1437 (11th Cir. 1991)). "For issues, however, on which the non-movant
would bear the burden of proof at trial, 'the moving party is not required to support
its motion with affidavits or other similar material negating the opponent's claim in
order to discharge this initial responsibility.'" *Id.* (quoting *Four Parcels*, 941 F.2d
at 1437–38).

*Nunez v. Coloplast Corp.*, 461 F. Supp. 3d 1260 (S.D. Fla. 2020) (J. Singhal).

### Breach of Contract

"'The elements of a breach of contract action are: (1) a valid contract; (2) a material breach;

and (3) damages.'" *Merin Hunter Codman, Inc. v. Wackenhut Corr. Corp.*, 941 So. 2d 396, 398

(Fla. Dist. Ct. App. 2006) (citations omitted). Under Florida law, "a material breach of [contract]

allows the non-breaching party to treat the breach as a discharge of his contractual liability."

*Bradley v. Health Coal., Inc.*, 687 So. 2d 329, 333 (Fla. Dist. Ct. App. 1997).

### Terminable at Will Contracts

Where a contract does not contain an express statement as to duration, courts should

determine the intent of the parties by examining the surrounding circumstances and reasonably

construing the agreement as a whole. *City of Homestead v. Beard*, 600 So. 2d 450, 453 (Fla. 1992).

"If a period of duration can be inferred from the nature of a contract and the circumstances surrounding its execution, the contract is not terminable at will and a court should give effect to the manifest intent of the parties."  *Id.*; *see also Iniguez v. Am. Hotel Reg. Co.*, 820 So. 2d 953, 956 (Fla. Dist. Ct. App. 2002).

## **DISCUSSION**

A.   *Levine's Motion for Partial Summary Judgment*

1.   Eby's Claim for Breach of Contract (Count I of the Complaint)

Levine contends that he is entitled to summary judgment on Count I of the Complaint, wherein Eby claims that Levine's conduct in the office area of the apartment in January 2020 constituted a breach of the SPA and Consulting Agreement.  Levine argues that this claim must fail because Eby cannot demonstrate the damages component of the claim.[7]  I disagree.

With regard to the costs Eby incurred to secure the apartment, Eby testified that in February 2020, as a direct result of Levine's unauthorized removal of confidential information from the office, he was compelled to reconfigure the apartment to ensure that the office area was separate and secure.  *See* Eby Dep. Tr. 234:2-235:4; 236:17-20.  Thus, I reject Levine's contention that there is "no evidentiary basis" for Eby's claim that he incurred costs to secure the office area of the apartment.

Moreover, I reject Levine's argument that Eby is precluded from seeking reimbursement of the consulting fees paid to Levine during the months following his alleged January 2020 breach.  According to Levine, the Counter-Defendants unreasonably delayed in notifying Levine of his alleged breach, and since they continued paying Levine his consulting fees through June 2020,

---

[7]  Levine's motion for summary judgment on Eby's breach of contract claim does not address the other elements Eby has the burden of proving.

they waived any claim for recovery of those fees.  As I discuss in greater detail in the next section, viewing the facts in the light most favorable to the non-movant (Eby), a reasonable jury could conclude that Eby met his burden of establishing that Levine breached the SPA and Consulting Agreement, that Eby did not unreasonably delay in notifying Levine of his breach, and thus Eby did not waive his right to recover as damages the consulting fees he paid to Levine following his breach.

Since Eby has produced sufficient evidence whereby a reasonable jury could find in his favor that Levine breached the SPA as well as the Consulting Agreement and that Eby suffered damages as a result, Levine's motion for partial summary judgment on Count I of the Complaint should be denied.

2. <u>Levine's Claims for Breach of the Consulting Agreement (Count II of the Amended Counterclaims) and Breach of Section 8 of the SPA (Count VI of the Supplemental Counterclaims)</u>

Levine seeks partial summary judgment on his Counterclaims Counts II and VI, which allege that the Counter-Defendants breached the SPA and Consulting Agreement by denying him access to the apartment since November 2020 and failing to pay his consulting fees since July 2020.  Levine requests the Court find that he has established the liability prongs of these breach of contract claims and submit only the issue of damages to a jury.  ECF No. 76 at 7.

Levine contends that pursuant to Section 2, the Consulting Agreement could only be terminated if the restaurant ceased to do business in the New York Tri-State area or if the restaurant was sold.  According to Levine, because neither of these events occurred, the Counter-Defendants had no right to stop paying him and he is owed his monthly consulting fees since July 2020.

Levine further contends that the Counter-Defendants unreasonably delayed notifying him of his alleged breach in January 2020, and thus, they are precluded from claiming that Levine's

initial breach relieved them of their obligations under the agreements (i.e., providing Levine access to the apartment and continued payment of Levine's consulting fees).  According to Levine, the delayed notification and the Counter-Defendants' continued payment of his consulting fees through June 2020, resulted in a waiver of their "first material breach" claim as well as Eby's claim for recovery of the fees paid to Levine following his alleged breach (see above).

The Counter-Defendants respond that they were entitled to terminate the Consulting Agreement after Levine's initial breach in January 2020, and that the delayed notification was reasonable given the exigent circumstances caused by the Covid-19 pandemic, which prolonged their ability to secure legal advice about terminating the SPA and Consulting Agreements.

It is well settled in Florida that while waiver of a known right may be implied by a party's conduct, "the conduct relied upon to do so must make out a clear case of waiver" and that "waiver does not arise merely from forbearance for a reasonable time." *MDS (Canada) Inc. v. Rad Source Techs., Inc.*, 720 F.3d 833, 852 (11th Cir. 2013) (citing *Taylor v. Kenco Chem. & Mfg. Corp.*, 465 So. 2d 581, 587 (Fla. Dist. Ct. App. 1985) and *Am. Somax Ventures v. Touma*, 547 So. 2d 1266, 1268 (Fla. Dist. Ct. App. 1989)).  I am also mindful that in Florida, the issue of waiver is a question of fact to be decided by the jury.  *See MDS (Canada) Inc.*, 720 F.3d at 851 (citing *Rutig v. Lake Jem Land Co.*, 155 Fla. 420, 20 So. 2d 497, 498 (1945) ("The question of waiver is usually one of fact for consideration by a trial jury on issues properly defined.")).

Even so, to the extent the issue of waiver involves questions of law (i.e., whether a delayed notification of a breach was *per se* unreasonable and prejudice resulted), I find that at this stage of the proceedings, Levine is not entitled to the entry of summary judgment on his Counterclaims Counts II and VI.  First, I find that the few months the Counter-Defendants delayed in notifying Levine of his alleged breach was not *per se* unreasonable.  The parties' agreements did not contain

a notice provision, requiring that notice be given to an allegedly breaching party of the purported breach within a specified period of time.  Even if the agreements had contained such a provision, it would only be valid if the required time frame was reasonable.  *See Coyote Portable Storage, LLC v. Pods Enterprises, Inc.*, 618 F. App'x 525, 535 (11th Cir. 2015) ("notice provisions must be reasonable") (citing *W.F. Thompson Constr. Co. v. Se. Palm Beach Cnty. Hosp. Dist*., 174 So. 2d 410, 414 (Fla. Dist. Ct. App. 1965)).  Second, notice provisions "can be enforced only when the failure to give notice causes prejudice to the opposing party."  *Coyote Portable Storage, LLC*, 618 F. App'x at 536–37 (citing *Travelers Indemnity Co. v. National Gypsum Co*., 394 So. 2d 481 (Fla. Dist. Ct. App. 1981)).

Guided by the parameters courts use in assessing the enforceability of notice provisions, I find that Levine has not established as a matter of law that the lapse of time between his presence in the apartment on January 20-21, 2020, and Eby's notice to him of the alleged breach via the filing of this lawsuit on June 10, 2020, was so unreasonable as to constitute a clear case of waiver. Nor has Levine demonstrated that he suffered any prejudice as a result of the delayed notification. Indeed, Levine admits that he did not seek access to the apartment until November 2020.  ECF No. 76 at 10; *see also* Levine's SOF ¶ 18 (ECF No. 75).  Thus, he was unaware of his exclusion from the apartment during those intervening months and cannot claim to have suffered prejudice because of it.  Moreover, Levine did not suffer any financial damages during this period because the Counter-Defendants continued to pay Levine his consulting fees through June 2020.[8]  Given

---

[8]  Admittedly, this fact may militate against the Counter-Defendants' recovery of the consulting fees they paid Levine after January 2020.  *See MDS (Canada) Inc.*, 720 F.3d at 853 (affirming trial court's finding that while a delayed notification of default did not waive a party's affirmative defense that the opposing party's first material breach excused its own subsequent non-performance, it precluded recovery of damages that accrued during the delay; "under Florida law, '[t]here is a distinction between a waiver of the right to treat a contract as discharged and a waiver of a right of action for damages for the breach'") (quoting *Rutig*, 20 So. 2d at 498).

that the delayed notification was not *per se* unreasonable (especially given the extenuating circumstances caused by the pandemic), and that Levine has not shown any prejudice caused by the delay, there is no basis to conclude at this stage that the Counter-Defendants have waived their right to assert that Levine was responsible for the initial breach that then excused their future non-performance.

Similarly, I reject Levine's argument that the Court should determine, as a matter of law, that the Consulting Agreement was not properly terminated because the restaurant was neither closed nor sold.[9]  Although neither of the two events specified in Section 2 of the Consulting Agreement as a basis for termination occurred, this did not preclude the Counter-Defendants' cancellation of the Agreement if Levine committed an initial, material breach.  "[T]he general rule is that a material breach of the Agreement allows the non-breaching party to treat the breach as a

---

[9] I also reject Levine's procedural argument that he did not receive proper notice that the Consulting Agreement was terminated.  Levine attested in his first Declaration that "[t]he first time I was notified . . . that I had supposedly breached the terms of the SPA or Consulting Agreement was when I read [Eby's] allegations after being served with a copy of his Complaint . . ." on June 10, 2020.  *See* Levine Decl. (ECF No. 77) at ¶ 11; *see also* Affidavit of Service (ECF No. 4).

Nevertheless, in his response to the Counter-Defendants' Additional Statement of Facts, Levine denies that this constituted "notice" under the SPA (ECF No. 95 at ¶ 23), a claim he reiterates in his second Declaration ("[n]either Robert Eby nor any of the Counter-Defendants ever gave any notice of termination to me of the agreements . . ."  *See* Levine Decl.2 (ECF No. 90-1) at ¶ 2)), and again in his response to the Counter-Defendants' motion for summary judgment where he makes the conclusory and unsupported statement that the Counter-Defendants "fail[ed] to comply with the Notice provision contained in the Consulting Agreement."  ECF No. 91 at 17.

Contrary to Levine's allegations, I find that this lawsuit alleging his breach of the SPA and Consulting Agreement constituted proper notice that the agreements were terminated.  Section 6 of the Consulting Agreement states that "notice . . . shall be sufficient if in writing and if personally delivered or sent by overnight . . . to Eric Levine, 2130 Milano Court, Palm Beach Gardens, Florida 33418 . . ."  ECF No. 1-1 at 28.  The Affidavit of Service indicates that Levine was personally served with a copy of the Summons and Complaint at his Florida home on June 10, 2020 (ECF No. 4), thus satisfying the notice provision.

discharge of his contract liability." *N. Tr. Invs., N.A. v. Domino*, 896 So. 2d 880, 882 (Fla. Dist. Ct. App. 2005) (quoting *In the Matter of Thomas*, 51 B.R. 653, 654 (Bankr. M.D. Fla. 1985)).  *See also Acquisition Corp. of Am. v. Fed. Deposit Ins. Corp.*, 760 F. Supp. 1558, 1560 (S.D. Fla. 1991) ("under Florida contract law a material breach of a contract excuses the nonbreaching party from his obligation to perform under the contract").

Here, there is no question that Levine's conduct in the apartment in January 2020 could qualify as an initial breach, since it occurred before the Counter-Defendants stopped paying his consulting fees.  The question then, assuming the jury found that Levine's conduct in the apartment during January 2020 was unauthorized, is whether that conduct constituted a material breach of the Consulting Agreement.  I find that the Consulting Agreement's confidentiality clause was an essential term and therefore any breach of it would be material.

"What is an essential term of a contract 'will vary widely according to the nature and complexity of each transaction and will be evaluated on a case by case basis . . .'" *King v. Bray*, 867 So. 2d 1224, 1228 (Fla. Dist. Ct. App. 2004) (quoting *Socarras v. Claughton Hotels, Inc.*, 374 So. 2d 1057, 1060 (Fla. Dist. Ct. App. 1979)).  Here, the language used in the SPA and the Consulting Agreement demonstrates that it was imperative to the Counter-Defendants that Levine respect and maintain the confidentiality of their business operations.  Notably, both agreements contain nearly identical confidentiality clauses, thus, indicating their importance.  Moreover, both agreements specifically state that if Levine fails to abide by the confidentiality requirements, he "recognize[s] that irreparable harm will result" to the Counter-Defendants and that "the remedy at law for any such . . . breach will be inadequate."  ECF No. 1-1 at 16-17, 26-27.[10]

---

[10]   Although Section 5 of the Consulting Agreement references the wrong numbered paragraph, this was obviously an unintentional typographical error.  ECF No. 1-1 at 27.

In addition to being essential terms, the confidentiality clauses were also dependent conditions. Under Florida law, a contractual provision is considered dependent

> where it goes to the whole consideration of the contract; where it is such an essential part of the bargain that the failure of it must be considered destroying the entire contract; or where it is such an indispensable part of what both parties intended that the contract would not have been made with the covenant omitted . . .

*SEB S.A. v. Sunbeam Corp.*, 148 F. App'x 774, 788 (11th Cir. 2005) (internal quotation marks and citations omitted). "Whether contractual provisions are considered dependent or independent is generally determined by the intent of the parties based on a reading of their entire contract. The general rule is that covenants are considered dependent unless a contrary intention appears in the document." *Taylor v. Genesee & Wyoming Inc.*, No. 3:13-CV-1250-J-39MCR, 2015 WL 12683821, at *5–6 (M.D. Fla. Sept. 25, 2015) (recommending denial of defendant's motion for summary judgment on counterclaim that plaintiff breached the parties' confidentiality provision, finding that the defendant committed a prior material breach and that the covenants were dependent) (citing *Richland Towers, Inc. v. Denton*, 139 So. 3d 318, 321 (Fla. Dist. Ct. App. 2014)), report and recommendation adopted, No. 3:13-CV-1250-J-39MCR, 2015 WL 12732898 (M.D. Fla. Nov. 13, 2015).

Here, there is nothing in the agreements to suggest that the confidentiality provisions were intended to be independent provisions. Rather, the crux of the Consulting Agreement was the expectation that Levine would act in the Counter-Defendants' best interest. It is axiomatic that if Levine was surreptitiously copying and removing confidential documents from the office area of the apartment, the Counter-Defendants could no longer trust Levine with access to the apartment or rely on his services as a consultant. Indeed, the confidentiality provisions specifically provide that Levine's use of the Counter-Defendants' confidential information "for his own benefit" would result in "irreparable harm" entitling the Counter-Defendants to seek "equitable relief," i.e.,

cancellation of the contract.  For these reasons, I conclude that if Levine's activities in the apartment in January 2020 violated the confidentiality provisions, such conduct would constitute an initial material breach.

Thus, a factfinder must determine whether Levine's conduct in the apartment's office in January 2020 amounted to a breach of those confidentiality provisions.  A jury must determine: (1) what Levine was doing in the apartment in January 2020, and (2) whether his conduct violated the parties' agreements.  It is for a jury to interpret the surveillance video, to assess the credibility of Eby and Levine, and ultimately, to determine whether Levine's activities in the office in January 2020 were authorized by the Counter-Defendants.[11]

Levine has not met his burden of proving that no genuine dispute exists as to any material fact, thereby entitling him to summary judgment.  Rather, viewing the evidence in the light most favorable to the non-moving Counter-Defendants, I find that a reasonable jury could conclude that the Counter-Defendants (1) did not breach the SPA and the Consulting Agreement by refusing Levine access to the apartment and cancelling his consulting contract (2) because Levine had already materially breached those agreements by engaging in unauthorized activities in the apartment, (3) thus relieving the Counter-Defendants from further performance.

Accordingly, I recommend that Levine's motion for partial summary judgment on Count II of his Amended Counterclaims (breach of the Consulting Agreement) and Count VI of his Supplemental Counterclaims (breach of the SPA's provision regarding access to the apartment) be

---

[11] I have reviewed the video evidence submitted by the Counter-Defendants.  The video does not present conclusive evidence regarding Levine's activities in the apartment in January 2020. Indeed, Levine's own testimony creates factual disputes in that he rejects the Counter-Defendants' characterization of his activities in the apartment, while simultaneously providing explanations for the conduct alleged.  Given the parties' conflicting interpretations of what the video depicts (as discussed in greater detail below), it is beyond my purview on summary judgment to make these credibility determinations and resolve these factual disputes.

denied.

3.  Levine's Claims for Breach of the Promissory Note and Guaranty (Counts III and IV of the Amended Counterclaims)

I find that Levine's motion for summary judgment on his claims that the Counter-Defendants breached the Promissory Note and Guaranty should be denied.  The evidence, viewed in the light most favorable to the Counter-Defendants, establishes that the Promissory Note was paid in full on May 1, 2020, and that this constituted substantial compliance.  The evidence viewed in this light also establishes that the Guaranty was not invoked, and that Levine did not incur any reimbursable costs in connection with obtaining payment of the Promissory Note.  Indeed, as discussed below (*infra,* at § B(3)), I find that the Counter-Defendants are entitled to summary judgment with regard to the Promissory Note.

B. *Eby and the Counter-Defendants' Motion for Partial Summary Judgment*

1.  Eby's Request for a Declaratory Judgment on the SPA's Line of Credit Provision (Count II of the Complaint)

In Count II of the Complaint, Eby seeks "a declaratory judgment that Eby is not required to utilize Levine's discretionary Line of Credit, pursuant to Section 8 of the Stock Purchase Agreement."  ECF No. 1 at ¶ 43.  According to the Complaint, "[t]here is an actual, present, and practical need for such a declaration because Levine has threatened legal action against Eby . . . Indeed, on June 8, 2020, Levine's attorney sent a demand letter . . . demanding, among other things, that Eby *must* request a line of credit, pursuant to the [SPA]."  *Id.* at ¶¶ 45-46 (emphasis in original).

Section 8 of the SPA provides in relevant part:

**8. Line of Credit.** The Seller shall make available to the Buyer/Robert Eby and Jay Silver a short term line of credit [LOC] . . . Funds under the LOC shall be advanced by the Seller, upon written notice from Buyer/Robert Eby and Jay Silver . . . Buyer must notify Seller, on or before the fifteenth (15th) of each calendar

20

month, of all LOC advance requests.

ECF No. 1-1 at 10.

In his motion for partial summary judgment, Eby argues that he is entitled to the entry of a declaratory judgment on Count II of the Complaint because on November 17, 2020, the District Court granted Eby's motion to dismiss Count I of Levine's Amended Counterclaim, which alleged a violation of the SPA's Line of Credit (LOC) provision.  ECF No. 36.

In its decision, the District Court noted that "the actual language used in the contract is the best evidence of the intent of the parties and, thus, the plain meaning of that language controls" (ECF No. 36 at 4 (quoting *Apple Glen Invs., L.P. v. Express Scripts, Inc.*, 700 F. App'x 935, 939 (11th Cir. 2017)), and that "unless an ambiguity exists, a court should not resort to outside evidence or the complex rules of construction to construe the contract."  ECF No. 36 at 5 (quoting *Banks v. Cashcall, Inc.*, 188 F. Supp. 3d 1296, 1301 (M.D. Fla. 2016)).

The District Court rejected Levine's claim that Eby and Silver were somehow required to request an advance on his line of credit each month, concluding that

> [T]here is no ambiguity surrounding the plain meaning of Section 8 of the SPA . . . . The unambiguous language of Section 8 does not obligate or require Eby or Silver to draw on Levine's line of credit each month. Instead, only Levine is required to advance the line of credit should Eby or Silver choose to make such request. Accordingly . . . Count I of the Amended Counterclaim fails to state a plausible claim for breach of contract. The Court will grant Counter-Defendants' motion dismiss Count I pursuant to Rule 12(b)(6).

ECF No. 36 at 5 (J. Dimitrouleas) (citing SPA [DE 1-1] at ¶ 8).

Notwithstanding the District Court's decision, Levine maintained during his deposition on May 21, 2021, that Eby had violated the LOC provision based on a subsequent oral modification. Similarly, in his second Declaration and response to the Counter-Defendants' Motion for Partial Summary Judgment, Levine attests that Eby's "course of conduct" established that the LOC

provision was "mandatory." *See* Levine Dec.2 (ECF No. 90-1) at ¶ 6; ECF No. 91 at 21-22. Thus, I find that Levine's adherence to this invalid claim establishes that there is an ongoing need for a Court declaration on this issue.

In light of the District Court's prior decision regarding the LOC, I find that the law-of-the-case doctrine applies. "Under the law-of-the-case doctrine, [the resolution of] an issue decided at one stage of a case is binding at later stages of the same case." *Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1289, 1291 (11th Cir. 2005) (quoting *Toole v. Baxter Healthcare Corp.*, 235 F.3d 1307, 1313 (11th Cir. 2000). "The doctrine operates to preclude courts from revisiting issues that were decided explicitly or by necessary implication . . ." *Schiavo ex rel. Schindler*, 403 F.3d at 1291 (citing *Luckey v. Miller*, 929 F.2d 618, 621 (11th Cir. 1991)). The only time that the doctrine does not bar reconsideration of an issue is when "(1) a subsequent trial produces substantially different evidence, (2) controlling authority has since made a contrary decision of law applicable to that issue, or (3) the prior decision was clearly erroneous and would work manifest injustice." *Silva v. Baptist Health S. Fla., Inc.*, 838 F. App'x 376, 383 (11th Cir. 2020) (citing *Wheeler v. City of Pleasant Grove*, 746 F.2d 1437, 1440 (11th Cir. 1984). None of these exceptions applies here.

Given that there is no basis for me to revisit the District Court's binding determination that the SPA was unambiguous in that it did not require Eby or Silver to draw on Levine's line of credit, I find that Eby is entitled to the declaratory judgment his seeks in Count II of the Complaint and that this portion of his Motion for Partial Summary Judgment should be granted.

2.   Levine's Claim for Breach of the Consulting Agreement (Count II of the Amended Counterclaims)

The Counter-Defendants seek summary judgment on Levine's claim that they breached the Consulting Agreement by stopping payment of his consulting fees. According to the Counter-Defendants, the Consulting Agreement was terminable at will and terminable for cause.

The Counter-Defendants contend that the Consulting Agreement was terminable at will because it required them to permanently employ Levine for an indefinite duration, without any mutual obligation from Levine.  ECF No. 79 at 6.  They also rely on Section 4 of the Agreement which states that Levine must return the Counter-Defendants' property upon "termination of the Consultant's services . . . irrespective of the time, manner or cause of same . . ." *Id.* (quoting ECF No. 1-1 at 27).[12]

Levine contends that the Court should not consider the Counter-Defendants' "termination" defenses because they were not pled as Affirmative Defenses and are therefore waived.  As for the merits of the Counter-Defendants' claim, Levine argues that the Consulting Agreement was not for an indefinite duration because it specifies two instances whereupon it can be terminated, namely, closure or sale of the restaurant.  Levine also argues that there is mutuality of obligation because the Consulting Agreement obligated him to provide consulting services for a certain number of hours each month.  ECF No. 91 at 16.

According to the Counter-Defendants, they were not required to assert that the contract was terminable at will as an Affirmative Defense.  ECF No. 87 at 4.  In support of this argument, they cite *Burford v. Acct. Prac. Sales, Inc.*, No. 12-CV-1212-JPG-SCW, 2014 WL 2974064 (S.D. Ill. July 1, 2014).  In *Burford*, the court addressed the plaintiff's argument that

> [D]efendants were delinquent for not pleading as an affirmative defense that the contract was terminable at will. He complains that he deserves an opportunity to respond to that argument. The argument that the contract was terminable at will is not an affirmative defense that needed to be pled in a responsive pleading pursuant to Federal Rule of Civil Procedure 8(c)(1). A defense is an affirmative defense if it can defeat liability even where the plaintiff proves his case. *Instituto Nacional De Comercializacion Agricola (Indeca) v. Cont'l Illinois Nat. Bank & Tr. Co.*, 576 F.

---

[12]  I reject the Counter-Defendants' argument that the language in Section 4 has any bearing on term of the Agreement because read in context, the sole purpose of this provision was to ensure the return of the Counter-Defendants' property upon termination of the Agreement.  It does not serve to expand the bases for terminating the contract provided in Section 2.

Supp. 985, 988 (N.D. Ill. 1983). If the defendant bears the burden of proving the defense and the defense does not controvert the plaintiff's case, it is an affirmative defense. *See Winforge, Inc. v. Coachmen Indus., Inc*., 691 F.3d 856, 872 (7th Cir. 2012) (citing *Brunswick Leasing Corp. v. Wisconsin Cent., Ltd.*, 136 F.3d 521, 530 (7th Cir. 1998)).

The argument that the contract was terminable at will would not have allowed APS to escape liability if Burford had proved a breach of the agreement. On the contrary, it would have countered the element of breach which Burford was required to prove to succeed on his breach of contract claim. Thus, it was not an affirmative defense required to be pled under Rule 8(c)(1). Additionally, Burford was not deprived of an opportunity to respond to APS's argument; he was able to respond to it in his response to the defendants' summary judgment motion.

*Burford*, at *2.

I agree with the court in *Burford* and find that the Counter-Defendants were not required to assert that the contract was terminable at will as an Affirmative Defense.  First, it is not one of the enumerated defenses listed in Rule 8(c)(1) that must be raised in an Answer or is waived. Moreover, the Counter-Defendants raised the terminable at will defense in response to Levine's claim that they breached the Consulting Agreement – it was raised to controvert Levine's Counterclaim Count II.  "Affirmative defenses are established only when a defendant *admits the essential facts* of the complaint and sets up other facts in justification or avoidance.  A defense which only points to a defect in a plaintiff's case is not an affirmative defense."  *Helman v. Nationstar Mortg., LLC*, No. 0:14-CV-60808, 2015 WL 11199691, at *1 (S.D. Fla. May 29, 2015) (J. Rosenberg) (citations and quotations omitted).

Thus, I will consider the merits of the Counter-Defendants' terminable at will defense.  The Counter-Defendants contend that the Consulting Agreement was terminable at will because it was for an indefinite duration.  According to the Counter-Defendants, "adopting Levine's interpretation would render the future termination of the Consulting Agreement entirely dependent upon potential, yet uncertain future occurrences — the speculative sale or closure of the business.  As

such, the Consulting Agreement's duration is indefinite, and the contract is unenforceable and terminable at will."  ECF No. 93 at 8.

I reject the Counter-Defendants' argument that the Consulting Agreement was for an indefinite duration and therefore, terminable at will.  The Consulting Agreement is unambiguous in that it contemplated two specific circumstances whereby the Agreement could be terminated: the closure or sale of the restaurant.  Although these events do not coincide with specific dates and the exact length of the term was unknown when the parties entered into the agreement, this does not equate to an indefinite duration.  More importantly, this is what the parties agreed to and the language in Section 2 of the Consulting Agreement is unambiguous.

I further reject the Counter-Defendants' claim that the Consulting Agreement is terminable at will because it lacks mutuality of obligation.  Levine's subjective belief that he was entitled to be paid his consulting fees even if he did not provide consulting services or in any other manner breached the Agreement is not determinative of the issue.  The language of the contract controls and it plainly states that Levine must be available up to thirteen hours per month to provide consulting services to the Counter-Defendants, in exchange for the Counter-Defendants paying him $5,500 per month.  Thus, the contract is supported by consideration and mutuality of obligation.

Despite the Consulting Agreement not being terminable at will, it is still subject to the longstanding principles governing contracts.  Accordingly, an initial breach by one party will relieve the other of continued performance, even if the agreed-upon occurrences for terminating the contract have not transpired.  In the case of non-performance by any party to a contract, the remedy is to bring an action for breach of contract, which the parties have done here.

As noted above, whether the Counter-Defendants can defeat Levine's claim that they

breached the Consulting Agreement (Count II of the Amended Counterclaims) depends on whether the Counter-Defendants had just cause for ceasing their monthly payments to Levine. In other words, the Counter-Defendants' success on Count II depends upon whether they can establish that Levine first breached the parties' agreements with his presence in the office area of the apartment and his unauthorized removal of confidential documents in January 2020.[13]

Viewing the facts in the light most favorable to Levine, a reasonable jury could agree with Levine's claim that the video does not conclusively establish that he took documents from a folder marked "Confidential" or that he rummaged through the office in search of a password to access the bookkeeper's computer. A reasonable trier of fact could also conclude that Levine's copying and removal of documents from the apartment's office in January 2020 was in accordance with his consulting activities, and that he had the authority to do so based on Levine's testimony regarding past practices. If a jury finds that Levine did not violate the confidentiality provisions, then the Counter-Defendants could not prevail on their claim that their termination of the Consulting Agreement was justified by Levine's initial breach. Thus, the Counter-Defendants have not met their burden of proving that no genuine dispute exists as to any material fact and

---

[13] The surveillance video here is akin to that viewed by the Court in *Shaw v. City of Selma*, 884 F.3d 1093, 1097 (11th Cir. 2018). In *Shaw*, the Eleventh Circuit considered an appeal of a summary judgment decision and held that "where the recording does not clearly depict an event or action, and there is evidence going both ways on it, we take the [non-moving party's] version of what happened." *Id.* at n.1.

Eby's surveillance video is distinguishable from that in *Scott v. Harris*, 550 U.S. 372 (2007). There, the Supreme Court admonished the lower courts for disregarding an irrefutable video recording. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment. That was the case here with regard to the factual issue whether respondent was driving in such fashion as to endanger human life. Respondent's version of events is so utterly discredited by the [videotape] that no reasonable jury could have believed him. The Court of Appeals should not have relied on such visible fiction; it should have viewed the facts in the light depicted by the videotape." *Id.* at 380-81.

viewing the facts in the light most favorable to Levine, the Counter-Defendants are not entitled to summary judgment on this claim.   Accordingly, I recommend that the Counter-Defendants' Motion for Partial Summary Judgment on Count II of the Amended Counterclaims (breach of the Consulting Agreement) be denied.

> 3.   Levine's Claim for Breach of the Promissory Note (Count III of the Amended Counterclaims)

The corporate Counter-Defendants, CSLL and LMC, seek the entry of summary judgment in their favor on Levine's Counterclaim Count III, alleging breach of the Promissory Note.  I find that this portion of their motion for partial summary judgment should be granted.

At the outset, I realize that "[t]here is almost always no such thing as 'substantial performance' of payment between commercial parties when the duty is simply the general one to pay. Payment is either made in the amount and on the due date, or it is not." *Treasure Coast, Inc. v. Ludlum Const. Co.*, 760 So. 2d 232, 234–35 (Fla. Dist. Ct. App. 2000).

Nevertheless, in considering whether an untimely payment constitutes a material breach of an agreement, Florida courts have held that time should be considered "of the essence" in three circumstances: (1) where there has been an express recital by the parties; (2) where the treating of time as a non-essential would produce a hardship, and delay by one party in completing or in complying with a term would necessarily subject the other party to a serious injury or loss; and (3) where there has been an express notice given to the defaulting party requiring the contract to be performed within a stated time, which must be a reasonable time according to the circumstances of the case. *Blaustein v. Weiss*, 409 So. 2d 103, 105 (Fla. Dist. Ct. App. 1982).  I find that none of these factors is present in this case.

Moreover, the facts of *Treasure Coast, Inc.,* are distinguishable from those present here. In *Treasure Coast, Inc.,* the parties entered into a settlement agreement requiring the defendant

construction company to make payments by a specific date but allowing for a ten-day grace period. The construction company made its payment one week *after* the ten-day grace period, which the court found to be a material breach and imposed the remedy provided in the settlement agreement. According to the court, "In providing appellant with a specific remedy, [namely,] judgment for the entire amount due and owing in the event of nonpayment, the parties essentially agreed that time was of the essence." *Id.*, 760 So. 2d at 235.

*Treasure Coast, Inc.* is distinguishable because the Counter-Defendants' payment to Levine was only one day late, not 17 days late. Moreover, the Promissory Note in this case did not contain a specific remedy for a late payment (other than the reimbursement of attorney's fees "necessar[ily]" incurred in collection efforts). There is nothing in this case to signal that in paying the Promissory Note, time was of the essence; in fact, Levine's April 24, 2020 demand letter could reasonably be construed as extending the Promissory Note's maturity date from April 30, 2020 to May 8, 2020, thus rendering the Counter-Defendants' May 1st balloon payment timely.

In any event, even assuming the Counter-Defendants failed to comply with their obligation under the Promissory Note because the balloon payment was one day late, I reject Levine's contention that the late payment amounts to a material breach and a default, thus invoking the attorney's fee provision of the Note. *See Rose v. Ditto*, 804 So. 2d 351, 351 (Fla. Dist. Ct. App. 2001) (reversing trial court and finding two-day delay in tendering $10,000 installment payment was not a material breach triggering default provision); *Edward Waters Coll., Inc. v. Johnson*, 707 So. 2d 801, 802 (Fla. Dist. Ct. App. 1998) (reversing trial court's imposition of settlement agreement's default provision for late payment, finding that "any breach which may have occurred by tendering payment one day late was not material" and caused defendant "no hardship").

At most, the one-day delay constitutes technical non-compliance, for which Levine has not

alleged any resulting damages that are recoverable, including attorney's fees.  The Promissory

Note provides for the reimbursement of attorney's fees "[i]n the event it become[s] necessary . . .

to employ counsel to collect" on the Note.  It was not necessary for Levine to send the first demand

letter on April 24, 2020 to obtain payment on the Promissory Note because Eby's April 23rd letter

did not list the Promissory Note as one of the payment obligations he could not meet.  Similarly,

Levine's second demand letter dated June 8, 2020, was also unnecessary (and thus an un-

reimbursable expense), because the balance due and owing on the Promissory Note had already

been paid in full.

Thus, I find that the corporate Counter-Defendants' payment of the Promissory Note on

May 1, 2020, did not constitute a material breach or a default.  Accordingly, the corporate Counter-

Defendants' motion for summary judgment on Levine's Counterclaim Counts III should be

granted.

4.   Levine's Claim for Breach of the Guaranty (Count IV of the Amended Counterclaims)

Counter-Defendants Eby and Silver seek the entry of summary judgment in their favor on

Levine's claim that they breached the terms of their personal guaranty.  Under the terms of the

Guaranty, Eby and Silver "unconditionally guarantee[d] . . . the prompt and unconditional payment

of all amounts due . . . pursuant to the [SPA], inclusive of any and all exhibits therein."  ECF No.

1-1 at 48.  For the reasons stated above, I find that Levine was not owed any amounts under the

Promissory Note or the LOC.  Nevertheless, because I have found that there are issues of fact as

to whether the Counter-Defendants were justified in terminating the Consulting Agreement, I am

precluded from finding as a matter of law that the Counter-Defendants Eby and Silver are not in

breach of the Guaranty.  Viewing the facts in the light most favorable to the non-movant (Levine),

a reasonable jury could conclude that he did not commit the first material breach and that therefore

the Counter-Defendants were not entitled to terminate the Consulting Agreement. Such a finding would make the Counter-Defendants liable for the consulting fees owed to Levine and thereby implicate the Guaranty. Accordingly, I recommend that the Counter-Defendants' Motion for Partial Summary Judgment on Count IV of Levine's Amended Counterclaims be denied.

     5.   <u>Levine's Claim for Invasion of Privacy (Count V of the Amended Counterclaims)</u>

Under Florida common law, the tort of invasion of privacy can take several different forms. Here, Levine's invasion of privacy claim is for "intrusion upon seclusion," which is where a person "intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns . . . if the intrusion would be highly offensive to a reasonable person." *Jackman v. Cebrink-Swartz*, No. 2D20-2384, 2021 WL 2171745, at *3 (Fla. Dist. Ct. App. May 28, 2021) (quoting Restatement (Second) of Torts § 652B (Am. Law Inst. 1977)); *see also Goosen v. Walker*, 714 So. 2d 1149, 1150 (Fla. Dist. Ct. App. 1998) (recognizing that engaging in repeated surveillance of another person can constitute the tort of invasion of privacy—intrusion upon seclusion).

The Florida Supreme Court has stated that intrusion upon seclusion includes "physically or electronically intruding into one's private quarters" and that "[t]he intrusion to which this refers is into a 'place' in which there is a reasonable expectation of privacy . . ." *Allstate Ins. Co. v. Ginsberg*, 863 So. 2d 156, 162 (Fla. 2003). Whether a person has an objectively reasonable expectation of privacy is a question of law for the Court to decide based on consideration of a variety of factors including property ownership, the right to exclude others, and whether the person was legitimately present. *Fed. Trade Comm'n v. PointBreak Media, LLC*, 343 F. Supp. 3d 1282, 1295 (S.D. Fla. 2018) (J. Altonaga).

The "highly offensive" element requires conduct that, viewed objectively, is "so

outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Metro. Life Ins. Co. v. McCarson*, 467 So. 2d 277, 278–79 (Fla. 1985). A person's subjective response to the conduct does not control. *Id.* "Whether the alleged conduct satisfies this high standard is a legal question for the court to decide as a matter of law." *Harrison v. City of Fort Lauderdale*, No. 17-61164-CIV, 2018 WL 9516029, at *6 (S.D. Fla. Dec. 21, 2018) (J. Gayles) (citing *Vance v. S. Bell Tel. & Tel. Co.*, 983 F.2d 1573, 1575 n.7 (11th Cir. 1993)).

The District Court addressed the dubious nature of Levine's expectation of privacy in the office area of the apartment in its order on the Counter-Defendants' motion to dismiss, stating that

> [w]hile the Court agrees with Counter-Defendants' general proposition that Levine had no legitimate expectation of privacy in an office area and therefore Levine will not be able to prevail on an intrusion claim with regard to alleged surveillance of the office area(s), the allegations in the Amended Counterclaim, as set forth *supra*, are sufficient to create a factual issue, at this stage of the litigation, as to whether the alleged intrusion by electronic surveillance occurred in private living quarters during non-working hours.

ECF No. 36 at 7-8 (J. Dimitrouleas). Thus, the District Court was reluctant to dismiss the claim before the record was sufficiently developed.

Now, however, the record has been developed through deposition testimony which establishes that the surveillance cameras were only present in the office area and were positioned to capture the bookkeeper's desk, computer, filing cabinets, and copier. Although Levine testified in his deposition that he could see a piece of the bathroom's shower curtain in the video recording, he acknowledged that once the bathroom door was closed, the surveillance camera would not be able to record any activities therein. *See* Levine Dep. Tr. 172:20-173:5; 214:13-215:6. Levine testified that he suffered humiliation because he was videotaped exiting the bedroom/bathroom area of the apartment and walking around the office area partially naked. *See* Levine Dep. Tr.

155:6-159:22.[14]

I find that as a matter of law, Levine did not have a reasonable expectation of privacy in the office area of the apartment. Levine did not own the apartment, did not have the right to exclude others, and was not legitimately present in the office area. The SPA specifically designated the two areas where Levine had authorized access, namely, the sleeping area and the bathroom. Therefore, Levine was not entitled to privacy in the office area and a surveillance video of him in that unauthorized area does not constitute an intrusion on his seclusion. Moreover, I find that the video recording submitted to the Court is not so outrageous as to be "beyond all possible bounds of decency, . . . regarded as atrocious, and utterly intolerable in a civilized community." *McCarson*, 467 So. 2d 277 at 278–79. For these reasons I find that the Counter-Defendants are entitled to summary judgment on Levine's claim for invasion of privacy in his Amended Counterclaim Count V.

## **RECOMMENDATION**

WHEREFORE, I **RECOMMEND** as follows:

1.  Defendant/Counter-Plaintiff Levine's Motion for Partial Summary Judgment (ECF No. 76) be **DENIED;** and

2.  Plaintiff/Counter-Defendants' Motion for Partial Summary Judgment (ECF No. 79) be **GRANTED IN PART AND DENIED IN PART** in that the declaratory judgment requested in Count II of Plaintiff Eby's Complaint be entered, as well as judgment in favor of the Counter-

---

[14]  Eleven seconds of the surveillance video submitted to the Court shows Levine from the back. He is standing facing the computer in apartment's office. He appears to be naked from the waist-down, however, he is wearing a shirt that covers his buttocks.

Defendants on Counts III and V of Levine's Amended Counterclaims and that those claims be dismissed with prejudice.

### NOTICE OF RIGHT TO OBJECT

A party shall serve and file written objections, if any, to this Report and Recommendation with the Honorable Aileen M. Cannon, United States District Court Judge for the Southern District of Florida, within **FOURTEEN (14) DAYS** of being served with a copy of this Report and Recommendation. Failure to timely file objections shall constitute a waiver of a party's "right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions." 11th Cir. R. 3-1 (2016).

**DONE AND SUBMITTED** in Chambers this 15th day of October, 2021, at West Palm Beach in the Southern District of Florida.

BRUCE REINHART
UNITED STATES MAGISTRATE JUDGE